UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

U.S. COMMODITY FUTURES
TRADING COMMISSION,

          Plaintiff,

v.

MY GLOBAL LEVERAGE, LLC and
TONEY BLONDO EGGLESTON,

          Defendants.

Case No. 2:15-cv-00745-APG-PAL

**ORDER GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AND PERMANENT INJUNCTION**

(ECF No. 16)

      Plaintiff U.S. Commodity Futures Trading Commission alleges that between July 16, 2011 and November 2012, the defendants solicited retail customers by telephone to engage in leveraged, margined, or financed precious metals transactions with nonparty Hunter Wise, LLC. ECF No. at ¶¶ 19, 21. Twelve customers allegedly paid $786,000 to the defendants, who received $257,680 in commissions and fees for the transactions. *Id.* at ¶ 25. However, the defendants failed to deliver the metals to the customers within 28 days as required by the Dodd-Frank Act. *Id.* at ¶ 24.

      The Commission filed suit on April 23, 2015, seeking restitution, a civil monetary penalty, and a permanent injunction. The defendants—who were served by publication in California and Nevada—have not appeared or otherwise responded to the Commission's allegations. ECF Nos. 13, 14. The Clerk of Court entered default against the defendants and the Commission now moves for default judgment, which I grant.

I.    **ANALYSIS**

      Obtaining a default judgment is a two-step process. *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). First, "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the

clerk must enter the party's default." Fed. R. Civ. P. 55(a). After the clerk enters default, a party must seek entry of default judgment under Rule 55(b).

Upon entry of default, the court takes as true the factual allegations in the non-defaulting party's complaint. Fed. R. Civ. P. 8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987) (quoting *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977)). Nonetheless, "[e]ntry of default does not entitle the non-defaulting party to a default judgment as a matter of right." *Warner Bros. Entm't Inc. v. Caridi*, 346 F. Supp. 2d 1068, 1071 (C.D. Cal. 2004) (citation omitted). Whether a default judgment will be granted is within the court's discretion. *Id.*

I consider the following factors in determining whether to grant default judgment: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claims; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72.

These factors show that default judgment is warranted in this case. Because the defendants have refused to participate in the case, the Commission is prejudiced by the defendants' frustration of the court proceedings. *See, e.g., PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("Potential prejudice to Plaintiffs favors granting a default judgment. If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery."). Additionally, the Commission has presented evidence on the merits of its case, including evidence that My Global Leverage violated 7 U.S.C. § 6(a) by soliciting and accepting offers for 12 off-market commodity transactions for future delivery and that Eggleston controlled My Global Leverage and knew or should have known that the transactions were illegal. *See, e.g.*, ECF Nos. 16-1; 16-2; 16-5; 16–7; 16–9; 16–10. The Commission has presented evidence supporting the calculation of the restitution remedy of $692,488. *See* ECF Nos. 16-1 at ¶¶ 14, 17–18 20; 16–9. And the Commission has presented

evidence showing that the defendants received a monetary gain of $257,680, which warrants the imposition of a civil monetary penalty of $773,040. *Id.* at ¶¶ 18–21; 7 U.S.C. § 13a-1(d)(1)(A) (authorizing civil penalties of "triple the monetary gain to the person for each violation").

The evidence provided by the Commission also warrants a permanent injunction under 7 U.S.C. § 13a-1(b). "Actions for statutory injunctions need not meet the requirements for an injunction imposed by traditional equity jurisprudence. Once a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations." *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979); *S.E.C. v. Ginsburg*, 362 F.3d 1292, 1304 (11th Cir. 2004). Factors to be considered in making this determination include: "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *Ginsburg*, 362 F.3d at 1304.

The defendants' infractions were not isolated but recurred twelve times. Indeed, the defendants operated in conjunction with Hunter Wise, an entity that the Southern District of Florida enjoined in connection with the same scheme. *U.S. Commodity Futures Trading Comm'n v. Hunter Wise Commodities, LLC*, 1 F. Supp. 3d 1311, 1320 (S.D. Fla. 2014). As a commodity trader who was formerly registered with the Commission, Eggleston knew or should have known that the 12 transactions violated 7 U.S.C. § 6(a). *See* ECF No. 16-1 at ¶ 10. And because the defendants have failed to appear in this action, there have been no assurances against future violations or recognition of the wrongful conduct.

There is little possibility of a dispute concerning material facts given both the Commission's well-pleaded complaint and the evidence it presented to support its allegations. *See Landstar Ranger, Inc. v. Parth Enter., Inc.*, 725 F. Supp. 2d 916, 921–22 (N.D. Cal. 2010) ("Since [plaintiff] has supported its claims with ample evidence, and defendant has made no attempt to challenge the accuracy of the allegations in the complaint, no factual disputes exist that

preclude the entry of default judgment."). Default was not due to excusable neglect because the defendants were properly served. *See Landstar*, 725 F. Supp. 2d 916, 922 (concluding that this factor favored default judgment and the "possibility of excusable neglect is remote" where defendant had been properly served). Finally, although policy favors decisions on the merits, these defendants have made no effort to defend themselves or participate in this case. Under these circumstances, default judgment in favor of the Commission and against defendants Toney Blondo Eggleston and My Global Leverage, LLC is warranted.

## II. CONCLUSION

IT IS THEREFORE ORDERED that the Commission's **motion for default judgment (ECF No. 16) is GRANTED**. I also accept and enter the Commission's proposed findings of fact and conclusions of law and grant the requested relief:

### A. *Findings of Fact*

The Commission is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act, 7 U.S.C. §§ 1 et seq., and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 et seq.

Defendant My Global Leverage, LLC is a Nevada limited liability company formed in December 2009. My Global Leverage's license to do business in Nevada lapsed at the end of 2012. Its principal place of business was in Las Vegas. My Global Leverage has never registered with the Commission in any capacity.

Between July 16, 2011 and November 2012, defendant Toney Blondo Eggleston was the managing member, owner, operator, and controlling person of My Global Leverage and managed its day-to-day operations. From 1999 to September 2012, Eggleston was registered with the Commission as an Associated Person ("AP") at several firms that were registered as Introducing Brokers, Commodity Trading Advisors and Commodity Pool Operators.

My Global Leverage introduced customers to Hunter Wise Commodities, LLC, a precious metals dealer that confirmed the execution of customer precious metals transactions. Hunter Wise was organized as a California limited liability company in July 2007 and was registered to

do business in Nevada. It maintained business addresses in Las Vegas, Nevada and Irvine, California. On its website, Hunter Wise held itself out as "a physical commodity trading company, wholesaler, market maker, back-office support provider, and finance company." Hunter Wise purported to offer, enter into, and confirm the execution of retail commodity transactions involving gold, silver, platinum, palladium, and copper throughout the United States using a network of telemarketing solicitors such as MGL that Hunter Wise referred to as "dealers."

On February 19, 2014, the United States District Court for the Southern District of Florida, granted the Commission's motion for summary judgment finding that Hunter Wise and other defendants violated 7 U.S.C. § 6(a). *Hunter Wise*, 21 F. Supp. 3d at 1320–22.

Between July 16, 2011 and November 2012, the defendants offered to enter into, executed, and confirmed the execution of financed precious metals transactions with persons who were not Eligible Contract Participants ("ECPs"), as defined in 7 U.S.C. § 1(a)(18)(xi). The defendants solicited individuals to invest in financed precious metals transactions through Hunter Wise.

During this period, My Global Leverage employed Eggleston and other individuals to, among other things, solicit retail customers to engage in financed precious metals transactions which constitute off-exchange retail commodity transactions.

Eggleston and My Global Leverage's other employees conducted solicitations by telephone. When soliciting customers for financed precious metals transactions, Eggleston represented that to purchase a certain quantity of metal, the customers needed to deposit a percentage of the total metal value, and that customers would receive a loan for the remaining amount. My Global Leverage's website stated that customers typically paid an initial minimum deposit of 20 to 25 percent of their metals purchases. Hunter Wise provided the financing for the remaining balance of the purchases. However, My Global Leverage did not disclose to at least some customers that Hunter Wise was involved in their financed precious metals transactions.

After a customer invested, My Global Leverage contacted Hunter Wise to effectuate the

transaction. My Global Leverage collected the funds needed for the transaction from the customer and sent the customer's funds to Hunter Wise. Hunter Wise provided back office support services to My Global Leverage and provided access to the details of the transaction to the customer via My Global Leverage's website.

My Global Leverage charged customers commissions and fees for purchasing the metal and interest on loans to buy metal. Hunter Wise provided My Global Leverage's share of the commissions and fees to My Global Leverage after it received a customer's funds from My Global Leverage.

My Global Leverage's customers did not take delivery of precious metals. Rather, most of their customers were speculating on the price direction of precious metals.

My Global Leverage introduced approximately 12 customers to Hunter Wise and received $786,085 from its customers for the purpose of engaging in leveraged precious metals transactions. My Global Leverage forwarded approximately $786,000 to Hunter Wise for the financing of precious metals transactions on behalf of My Global Leverage's customers. My Global Leverage returned $93,597 to its customers. The total amount of losses incurred by the defendants' customers is the difference between these amounts, which is $692,488.

My Global Leverage received from Hunter Wise commissions and fees totaling $257,680 for the retail, off-exchange precious metals transactions that the defendants executed through Hunter Wise on behalf of the defendants' customers.

My Global Leverage and Hunter Wise never bought, sold, loaned, stored, or transferred any physical metals for these financed precious metals transactions. Likewise, My Global Leverage and Hunter Wise never delivered any precious metals to any customers with respect to these financed metals transactions.

At all times relevant, the financed metals transactions that My Global Leverage entered into with its customers were not made or conducted on, or subject to, the rules of any board of trade, exchange or contract market.

At all times relevant, Eggleston was the managing member and owner of MGL.

Eggleston exercised control over the day-to-day operations of My Global Leverage. Eggleston was a signatory on My Global Leverage's bank accounts and entered into agreements on behalf of My Global Leverage.

### B.  *Conclusions of Law*

7 U.S.C. § 13a-1 authorizes the Commission to seek injunctive relief against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or of any rule, regulation, or order thereunder.

Pursuant to 7 U.S.C. §§ 2(c)(2)(D) and 13a-1, the Commission has jurisdiction over the conduct and transactions at issue in this case. Pursuant to 7 U.S.C. § 13a-1(e), venue properly lies with this Court because the defendants transacted business in this District, and certain transactions, acts, and practices alleged in this Complaint occurred, or are occurring, within this District.

With respect to conduct occurring on or after July 16, 2011, and subject to certain exceptions not applicable here, 7 U.S.C. § 2(c)(2)(D) gives the Commission jurisdiction over "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a non-ECP "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" ("retail commodity transactions"). 7 U.S.C. § 2(c)(2)(D) makes 7 U.S.C. § 6(a) applicable to retail commodity transactions "as if" such transactions are contracts for the sale of a commodity for future delivery.

The Act defines an ECP, in relevant part, as an individual who has amounts invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the individual enters into the transaction to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. 7 U.S.C. § 1a(18)(A)(xi).

7 U.S.C. § 6(a), in relevant part, makes it unlawful for any person to offer to enter into, execute, confirm the execution of, or conduct any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any

transaction in, or in connection with, a contract for the purchase or sale of a commodity for future delivery unless the transaction is conducted on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

The precious metals transactions discussed in the Commission's Complaint and in paragraphs 25-26 below are commodities as defined by 7 U.S.C. § 1a(9).

By the conduct described in paragraphs above, from July 16, 2011 until at least November 2012, defendants My Global Leverage and Eggleston violated 7 U.S.C. § 6(a) by offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, transactions in, or in connection with, retail commodity transactions that were not conducted on a Commission-designated contract market.

Each offer to enter into, entrance into, execution, confirmation, solicitation, or acceptance of an order for a retail commodity transaction made during the relevant period was a separate and distinct violation of 7 U.S.C. § 6(a).

Eggleston directly or indirectly controlled My Global Leverage and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting My Global Leverage violations of 7 U.S.C. § 6(a). Therefore, pursuant to 7 U.S.C. § 13c(b), Eggleston is liable for each of MGL's violations of 7 U.S.C. § 6(a) as a controlling person of My Global Leverage.

### C. Relief

Based upon and in connection with the conduct described above, pursuant to 7 U.S.C. § 13a-1 (2012), Defendants are **permanently restrained, enjoined, and prohibited** from directly or indirectly offering to enter into, entering into, executing, confirming the execution of, or conducting an office or business in the United States for the purpose of soliciting or accepting orders for, or otherwise dealing in, transactions in, or in connection with, retail commodity transactions not conducted on a Commission-designated contract market.

Defendants are also **permanently restrained, enjoined, and prohibited** from directly or indirectly:

  a. trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));

  b. entering into any transactions involving commodity interests (as that term is defined in 17 C.F.R. § 1.3(yy) (2015)) for their own personal accounts or for any account in which they have a direct or indirect interest;

  c. having any commodity interests traded on their behalf;

  d. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

  e. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

  f. applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9) (2015); and

  g. acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2015)), agent, or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38) (2012)) registered, required to be registered, or exempted from registration with the Commission, except as provided for 17 C.F.R. § 4.14(a)(9) (2015).

Defendants shall **pay, jointly and severally, restitution** in the amount of $692,488 ("Restitution Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).

To effect payment of the Restitution Obligation and the distribution of any restitution payments to the defendants' customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall collect restitution payments from the

defendants and make distributions as set forth below.  Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

The defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "My Global Leverage -- Restitution Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, with a cover letter that identifies the paying the defendants and the name and docket number of this proceeding.  The defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the defendants' customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as Civil Monetary Penalty ("CMP") payments, which the Monitor shall forward to the Commission following the instructions for CMP payments as set forth below.

The defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify the defendants' customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments.  The defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment, or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to the defendants' customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

Pursuant to Rule 71, each customer of the defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the Restitution Obligation that has not been paid by the defendants, to ensure continued compliance with any provision of this Order and to hold the defendants in contempt for any violations of any provision of this Order.

To the extent that any funds accrue to the U.S. Treasury for satisfaction of the defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

The defendants shall **pay, jointly and severally, a civil monetary penalty** in the amount of $773,040 ("CMP Obligation"), plus post-judgment interest. Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order, pursuant to 28 U.S.C. § 1961 (2012).

Defendants shall pay their CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

/ / / /

>Commodity Futures Trading Commission
>Division of Enforcement
>ATTN: Accounts Receivables
>DOT/FAA/MMAC/AMZ-341
>CFTC/CPSC/SEC
>6500 S. MacArthur Blvd.
>Oklahoma City, OK 73169
>(405) 954-7262 office
>(405) 954-1620 fax
>nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. The defendants shall accompany payment of the CMP Obligation with a cover letter that identifies the defendants and the name and docket number of this proceeding. The defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**Partial Satisfaction.** Acceptance by the Commission or the Monitor of any partial payment of the defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**Notice.** All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

>Richard Glaser, Deputy Director
>U.S. Commodity Futures Trading Commission
>Division of Enforcement
>1155 21st Street, N.W.
>Washington, DC 20581

Notice to the NFA:

>Daniel Driscoll, Executive Vice President, COO
>National Futures Association
>300 S. Riverside Plaza, Suite 1800
>Chicago, IL 60606-3447

All such notices to the Commission or the NFA shall reference the name and docket number of

this proceeding.

**Change of Address/Phone.** Until such time as the defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Order, the defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

**Invalidation.** If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

**Continuing Jurisdiction of this Court.** This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order.

**Injunctive and Equitable Relief Provisions.** The injunctive and equitable relief provisions of this Order shall be binding upon the defendants, upon any person under the authority or control of either defendant, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with either defendant.

There being no just reason for delay, the Clerk of the Court is directed to enter this Order forthwith and without further notice.

DATED this 26th day of August, 2016.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE